(Rev. 5/05)

**FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT**
**UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. §1983**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

(1) Joni L. Johnson # 00182823
(Name of Plaintiff)      (Inmate Number)

660 Baylor BLVD, Newcastle DE 19720
(Complete Address with zip code)

_____
(Name of Plaintiff)      (Inmate Number)

1:07:CV-394-GMS
(Case Number)
( to be assigned by U.S. District Court)

_____
(Complete Address with zip code)

(Each named party must be listed, and all names
must be printed or typed.  Use additional sheets if needed)

vs.

**CIVIL COMPLAINT**

(1) Joseph Biden III, ATTorney General
State of Delaware
(2) Carl Danberg, Commissioner, Dept of
Corrections.
(3) Rick Kearney, Chief Bureau of Prisons
(Names of Defendants)
In their Individual and official capacity
(Each named party must be listed, and all names
must be printed or typed.  Use additional sheets if needed)
Further △'s Attached

Jury Trial Requested

**FILED**

OCT 19 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

**I.    PREVIOUS LAWSUITS**

☒ Scanned

A.    If you have filed any other lawsuits in federal court while a prisoner, please list the caption and case number
including year, as well as the name of the judicial officer to whom it was assigned:

In 2000 case dismissed when transferred out of BWCI to Danbury, CT.
Johnson V. Brady, etal with class Action Request
etal

* Currently have case no: 1:07-CV-394-GMS
filed Johnson v. Biden, etal June 2007 Request for
Preliminary Injunctive Relief and summary Action For
Court interception Regarding Law Library Access to Allow ∆ to
Perfect Direct Appeal to Supreme court of De # 319, 2007
- and - Research and Prepare 42 usc §1983 for multiple
Civil Rights Violations and possible class Action Status.

## II.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

In order to proceed in federal court, you must fully exhaust any available administrative remedies as to each ground on which you request action.

A.    Is there a prisoner grievance procedure available at your present institution?    ☑ Yes    ☐ No

B.    Have you fully exhausted your available administrative remedies regarding each of your present claims?    ☑ Yes    ☐ No

C.    If your answer to "B" is Yes:    multiple —

   1.  What steps did you take? Griavances and Appeals along with Requests for Staff intervention filed

   2.  What was the result? no Result or Request Denied At All times — photocopies + Logs Attached —

D.    If your answer to "B" is No, explain why not: n/a

note — many grievances went unanswered

## III.    DEFENDANTS (in order listed on the caption)

(1) Name of first defendant: Joseph Biden III

Employed as Attorney General at State of Delaware

Mailing address with zip code: 820 French St, Wilmington, De 19801

(2) Name of second defendant: CARL Danberg

Employed as Commissioner at Dept of Corrections

Mailing address with zip code: 245 McKee RD Dover, DE 19901

(3) Name of third defendant: Rick Kearney

Employed as Bureau Chief at Bureau of Prisons/Dept. of. Corrections

Mailing address with zip code: 245 McKeo Rd Dover, DE 19901

(List any additional defendants, their employment, and addresses with zip codes, on extra sheets if necessary)

## IV. STATEMENT OF CLAIM

(State as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach no more than three extra sheets of paper if necessary.)

This matter is pending Preliminary Injunctive Relief

1. ✱ Denial of Adequate Access to Law Library
— π has been trying to get ample access to work on Appeal to Delaware Supreme Court 319, 2007 -AND- Prepare 42 USC 1983 against BUCI, et al for Multiple Civil Rights Violations. Access is sporadic, deliberately void, and Not consistnt with Access to Courts. Direct Criminal Appeal to sentence + conviction  case no.

2. Prison Conditions; Safety hazards;
Food service; Lack of Exercise; overcrowding; and Staff Retaliation in Section II 'Potential for Violence, fire hazards, Staff misconduct ✱see Attached

§III. mentally ill Im's housed with general Population

3. §II Denial of Religious Rights
§I Due Process Violations
— Disciplinary + Classification decisions are Made w/o Consideration or Communication w/ Staff or Inmate involved. Loss of good time, work time + program time without being served with documents or allowing a hearing, or presentation of evidence as Required by 14th Amendment.

## V. RELIEF

(State briefly exactly what you want the Court to do for you. Make no legal arguments. Cite no cases or statutes.)

1. ① Initially I need the Court to intercede with the Law Library issue And order the prison to allow me adequate Access in consideration of my Constitutional Rights to Access The courts 1st, 6th +14th. Inmate Johnson, π needs at least 10-15 Hours per week pending Completion of Delaware Supreme Court Appeal and/or Appointment of Competnt Appellate Counsel.

② For the Court to order an agency to investigate and oversee the prison Administrative staff; clean-up the prison to bring to Safety and Health Standards; criminal Investigation into the Staff misconduct, physical Abuse of inmates and financial Issues Regarding Medical (cms) and BUCI Administration; order of compliance in all other issues and Cease and Decist in continued Due Process Violations.

2.  A full scale investigation is Necessary into the Medical Financial issues/ Medicaid billing of prisoners/ And the competence of various medical staff, including the lack of Reasonable And/or necessary TX of Inmates. Further LACK of medical equipment.

3.  Investigate And stop prison officials, namely the warden and other Administrative Staff from Deliberately violating Civil Rights And Retaliating for the exercise of Constitutional Access to the courts.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___9___ day of _October_ , 2007.

_Jeni R. Johnson_
(Signature of Plaintiff 1)

_____
(Signature of Plaintiff 2)

_____
(Signature of Plaintiff 3)

4

Printed on: Thursday, June 28, 2007 16:05:48 EDT

### Case History Search

Search Created:
Thursday, June 28, 2007 16:05:48 EDT

| Court: | DE Supreme Court | Judge: | Delaware, Supreme Court | File & Serve Live Date: | 6/28/2007 |
|--------|------------------|--------|-------------------------|--------------------------|-----------|
| Division: | | Case Number: | 319,2007 | Document(s) Filed: | 3 |
| Case Type: | Appeal - Superior | Case Name: | Johnson, Joni v. State of Delaware | Date Range: | All |

1-2 of 2 transactions  << Prev Page 1 of 1 Nex >>

| Transaction ▽ | Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Size |
|---------------|-----------|--------|------------------------|-------------------------|---|---------------|----------------|------|
| 15401616 | 6/28/2007 4:05 PM EDT | File And Serve | 319,2007 Johnson, Joni v. State of Delaware | Supreme Court Delaware, DE Supreme Court | | Letter | Letter dated 6-28-07 from Senior Court Clerk to Daniel Tyrrell, Esquire, directing him to recognize his continuing obligation by 7-9-07. (lsb) | 0.1MB |
| 15400811 | 6/28/2007 3:52 PM EDT | File And Serve | 319,2007 Johnson, Joni v. State of Delaware | Supreme Court Delaware, DE Supreme Court | 1 | Notice of Appeal | Notice of appeal from the Order dated 6-4-07 in the Superior Court in and for Kent County, by Judge Young, in Cr. Nos. 0605024572,0608024171, and 0607005654, with designation of no transcript. (served by mail on 6-26-07) (lsb) | 0.5MB |
| | | | | | 2 | Motion - Other | Motion for appoinment of counsel and waiver of filing fees by appellant. (lsb) | 0.2MB |

1-2 of 2 transactions  << Prev Page 1 of 1 Nex >>

Mr. O'Connor
*Law Library BWCI*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/18/2007 | ●1 | MOTION for Preliminary Injunction - filed by Joni L. Johnson. (Attachments: # 1 Letter to Clerk)(lid) (Entered: 06/22/2007) |
| 06/19/2007 | ●2 | ADDENDUM To The Motion For Preliminary Injunctive Relief and Summary Judgment by Joni L. Johnson. Amendment to 1 MOTION for Preliminary Injunction. (lid) (Entered: 06/22/2007) |
| 06/19/2007 | ●3 | Notice of Availability of a U.S. Magistrate Judge to Exercise Jurisdiction (lid) (Entered: 06/22/2007) |
| 06/27/2007 | ● | Case assigned to Judge Gregory M. Sleet. Please include the initials of the Judge (GMS) after the case number on all documents filed. (rjb) (Entered: 06/27/2007) |
| 07/03/2007 | ●4 | Letter to Clerk of Court from Joni Johnson regarding receipt of motion for preliminary inunction. (mmm) (Entered: 07/05/2007) |
| 07/05/2007 | ● | EXIT copy of the docket sheet to the pro se plaintiff on 7/5/07. (mmm) (Entered: 07/05/2007) |
| 07/05/2007 | ●6 | Letter to Clerk of Court from Joni Johnson regarding letters (and attachments) regarding use of the law library. (mmm) (Entered: 07/06/2007) |
| 07/06/2007 | ●5 | Filing Fee of $350.00 Assessed. Plaintiff requested to submit IFP application and trust fund account statement. Failure to submit items within 30 days will result in dismissal of action without prejudice. (Copy to pltf.). Notice of Compliance deadline set for 8/9/2007. Signed by Judge Gregory M. Sleet on 7/6/07. (mmm) (Entered: 07/06/2007) |
| 07/10/2007 | ●7 | Letter to Clerk of Court from Joni L. Johnson regarding attached IFP. (mmm) (Entered: 07/11/2007) |
| 07/10/2007 | ●8 | MOTION for Leave to Proceed in forma pauperis - filed by Joni L. Johnson. (mmm) (Entered: 07/11/2007) |
| 07/13/2007 | ●9 | ORDER granting Motion to Proceed IFP. Filing Fee of $350.00 Assessed. An initial partial filing fee of $2.80 shall be required. Plaintiff shall return the attached payment authorization within 30 days. Failure to return payment authorization shall result in dismissal of action without prejudice. (Copy to pltf.). Notice of Compliance deadline set for 8/16/2007. Signed by Judge Gregory M. Sleet on 7/13/07. (mmm) (Entered: 07/13/2007) |
| 07/26/2007 | ●10 | Letter to Clerk of Court from Joni Johnson regarding request for updated docket sheet. (mmm) (Entered: 07/30/2007) |

13

## DELAWARE MENTOR PROGRAM

The Delaware Mentor Program (Phase I) offers 48-52 educational workshops, designed to help women take a look at their core issues, develop an understanding of how they made poor choices, shakedowns, lockdowns, and other functions. Your responsibility is set new goals for their lives and begin to acquire the values, knowledge and skills required to become productive members of the community.

Graduates of the Phase I Program receive certificates upon successful completion of this twelve-week program.

In addition, the Delaware Mentor Program offers group meetings, referrals, and one-on-one mentoring at DJBWCI, Plummer Community Center, and Sussex Work Release Center.

## MENTAL HEALTH

Mental health services are provided by an independent medical service provider. DUBWCI has a duly qualified mental health professional assigned to the institution. This person provides both individual and group counseling.

Individual appointments are scheduled via written requests from residents. When necessary, this contractor does psychological evaluations for classification purposes.

Group meetings are once a week for 26 weeks and participants are given certificates upon successful completion.

## THE HARBOR

The Harbor Program is located in Unit 6 to help residents with special needs and challenges. Those special needs residents will get individualized services while housed at the Harbor. Classification will make the final determination as to the participants in the program.

## HORTICULTURE

Horticulture is a seasonal job in which classified residents learn about the planting, and gardening of various fruits and vegetables. Space is limited. In order to be considered, send your requests to classification.

## SECURITY

Our security staff are here to help you, as well as provide for the order and safety of the institution. To accomplish this, correctional officers need to perform routine headcounts, searches, shakedowns, lockdowns, and other functions. Your responsibility is to cooperate and follow the orders and instructions given by correctional staff.

## TELEPHONE CALLS

1.  Upon entrance into the institution, you may be permitted to make one phone call.
2.  You are asked to complete a form and list the names, addresses, and telephone numbers of 10 people who you can call collect.
3.  The telephones in your unit are on the same times everyday (10:00 am until 3:00 pm and 6:00 pm until 10:00 p.m).
4.  You are permitted to make up to three 15 minute phone calls a day.
5.  According to BWCI Policy 7.51, if a No Contact Order prevails, you are not allowed to contact that individual via telephone.
6.  Collect calls can be made from your housing unit. When placing a call enter your SBI number.
7.  It is your responsibility to find individuals who will accept collect calls.
8.  Your counselor or the law librarian will only assist in making appropriate phone calls to state or professional organizations. (See Sections on Law Library and Institutional Counselors)
9.  Do not request personal calls from any staff. Emergencies are reviewed on a case by case basis.
10. Internal Affairs can be reached on 1-800 364-9667.
11. Any changes to your original telephone list will be made during the first two weeks of March, June, September, and December or at the discretion of the telephone monitor.

## LAW LIBRARY

The Law Library is open Monday through Friday (except on state holidays). The Law Library provides the following services for residents of BWCI

Assistance with legal research, typing, copying, Family Court matters, (visitation, custody, guardianship, etc.,), and legal phone calls to Public Defender/Private Attorney.

**Personal calls will not be permitted from the Law Library.**

If you need to make a Law Library appointment, you must sign your full name on the scheduling sheet in your unit. In addition to your name, provide the reason(s) for making the appointment. Failure to do so will result in the loss of your appointment for that day.

42 USC § 1983

I.   Denial of Adequate Law Library Access

The Staff at BWCI, Law Librarian George O'Connor, Senior Classification officer Colleen Shotzburger and Warden Patrick Ryan have all hindered π's multiple attempts to have adequate time for Research and preparation of documents in The Prison Law Library.

π has Strived since March 2007 to get Adequate time in Law Library Just to Research the Legal Aspects of her own criminal case — Furthermore, following the first couple of months at BWCI, π has witnessed and/or been affected by A multitude of Civil Rights violations of which will be addressed in the herein Petition.

Once The Administrative staff learned of π's Research and became aware of the Exhaustion of Administrative Remedies in that π was preparing to file 42 USC § 1983, π was then Restricted from Law Library Access. The refusal to allow π into the Law Library was done by non-response to her multiple Requests and filing of grievances from April 2007 through June 2007. As a Result of π's inability to go to the Law Library; on May 31, 2007 π's defense counsel came to the BWCI to inform her that the State was declaring her An habitual offender, pursuant to 11 DE.C. § 4214(a) because of specific criminal History points. π Noticed that one of the priors being counted towards the Three Strikes Provision was a 2004 arrest and guilty plea to "Criminal Impersonation". π was Adamant that the CR. imp. was in fact a misdemeanor and Not a felony. Defense counsel, being very inexperienced told π that it was being counted and because the prosecutor said so — it must be true. π was then informed that she would be in Court on Monday, June 4 regarding this matter.

I. Continued

TT immediately sent the Law Library an Emergency Request To Allow her to go into the prison Law Library on June1 to verify what Counsel was telling her. TT felt as though she was Right, and that CR.Imp. was A misdemeanor, but Without verification, she could not stand up to The Deputy Attorney General AND criminal Defense Counsel. Accordingly, TT entered her guilty plea based on erroneous information and Legal Advice causing her to wrongfully be convicted under 11 Del.C. § 4214(a). TT is now pending appeal with The Delaware Supreme Court, and proceeding without benefit of counsel, because she Refuses to Accept Any Representation from defense Counsel Referenced herein. Therefore, TT needs "Special circumstances" time in the Law Library to perfect Appeal.

Furthermore, TT needs time in the Law Library to work on filing of 42 USC § 1983 against BWCI Staff; Request (Research & Review) Class Action Status; Research and Review points of Law; Prepare pleadings.

On June11, 2007 TT was Accused, falsely of Stealing a law book from the Law Library, which has been used as A basis until September 2007 to keep TT out of the Law Library Because The warden and Treatment Services Staff do not want TT in the law library to prepare Civil Rights suit.

I. Continued

This matter has been pending within this Honorable Court since June 18, 2007 "Motion for Preliminary Injunction"

The June 11, 2007 Incident has Actually escalated AT the BWCI against π in that she has been allegedly charged with Theft And the Class I Disciplinary Report placed in the DACS system, with A finding of guilt and A sanction that π must Be housed in maximum security, unit 5 for 6-12 months because of the I.R. Yet π has never seen the Report, been served or had a hearing Regarding the trumped up charge — this issue will be further Addressed under the Due Process Violations § herein. Staff At BWCI, namely The Warden and Colleen Shotzburger cire using this As A means to hinder π from completing 42 USC § 1983.

In Lewis v. Casey, 518 U.S. 343, 116 S.CT 2174, 135 L.ED. 2d 606 (1996) The Supreme Court held that the right of A prisoners Access to the courts is limited to "Non frivolous lawsuits that Attack prison sentences or challenge the conditions of confinement".

Therefore, As The Prison Law Library At BWCI has failed to Allow Access to the law library sufficiently to research and prepare Active legal proceedings The BWCI should be found to have non-Adequate Access to the courts, Retaliatory + vindictive Actions, further π's contention.

Note

* The Law Library Access issue continues on + on — Every now and then O'Connor will call me 1 or 2 days (Last week he gave me 5 hours) — then I will not be called again for a month. It is all deliberate to try + keep me from researching and preparing 42 USC § 1983 *

* I was kept out of the Law Library from early June 2007 until Sept 2007. Kept out in ½ of April + All of May. *

In consideration of Supreme Court of Delaware Direct Appeal brief being due in 30 days and work I am doing on 42USC§ 1983 — I cannot Trust Prison Administration to Keep calling me down to Law Library.

Carl Danberg and Rick Kearney have denied my Grievances to be handled by the Prison. The Warden has been firm that I will not Receive Special circumstances time in Law Library. He said I am to go through same procedure as other Inmates. The procedure is to sign up on sheet and wait until the following month to be called. They are just now calling the list from 9/5/07. Every now + then I will be called from an urgent note that is sent to Mr. O'Connor. Lately, he has been more cooperative, but that is subject to quick change on order of Warden Ryan or Colleen Shotzburger. With my Direct Appeal + pro se status pending I cannot chance their pattern of Retaliatory conduct. I need Adequate Access to complete my pleadings, Research and Preparation.

42 USC 5 1983

## II. Prison Conditions

A claim that prison conditions or practices constitute cruel and unusual punishment must satisfy two tests. (OBJECTIVE AND subjective)

(i) The objective test requires that prison conditions be bad enough to be considered cruel and unusual. To violate the Eighth Amendment, conditions must amount to "unquestioned and serious deprivations of basic human needs" or of the "minimal civilized measure of life's necessities", or constitute the "wanton and necessary infliction of pain".

Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. CT 2392, 2399, 69 L Ed. 2d 59, 69 (1981).

More recent Supreme Court cases emphasize threats to prisoners health and safety that "pose an unreasonable risk of serious damage to future health" or "excessive risks to inmate health or safety".

Helling v. McKinney, 509 U.S. 25, 35, 113 S.CT 2475, 125 L.ED. 2d 22 (1992) (exposure for future health concerns); Farmer v. Brennan, 511 U.S. 825, 114 S.CT. 1970, 128 L.ED 2d 811 (1994) (Risk of violence).

However, under some circumstances conditions need not inflict or threaten serious injury to meet the objective test of the Eighth Amendment. The Supreme Court has said that cell searches or other activity, amounting to "calculated harassment unrelated to

IV    Con't

prison needs" may constitute cruel and unusual punishment, and that excessive force may violate the Eighth Amendment even if it inflicts little injury if it is "repugnant to the conscience of mankind". Hudson v. McMillan, 503 U S 1 at 10. (Allowing claim to go forward even where no significant injury or need for medical attention).

It is possible that other conditions that do not actually inflict physical injury (for example, credible threats of immediate harm that are not acted on, or acts that amount to psychological torture) may also be considered cruel + unusual punishment." id.

Secondly, The subjective test requires that prison officials have a certain state of mind in order to be found to have violated the Eighth Amendment. In reference to prison conditions, there is a "deliberate indifference" standard, whereas, the officials must have had actual knowledge that they were subjecting the inmate to the excessive risk of harm or other objectively unconstitutional conditions. The official must have intent of malice and sadistical (Farmer at 843; Rhodes at 347) intent of harm.

A. <u>SAFETY HAZARDS</u>

1.) <u>MOLD</u>. There is black mold throughout the entire building. When placing a Q-tip up into the air-vents - they come out with black-slimey substance, consistent with black mold. The building sits on wet lands and the mold is literally eating the outside of the building, growing into entrance/exit ways and dripping through the ventitation system.

Severe medical problems/Respiratory illness is exacerbated and in some cases initialized by the mold in the air.

TT Suffers with COPD, Pulmonary Fibrosis, Asthma and Bronchitis which is exacerbated by the "sick air", as are multiple other inmates. Medical personnel alleges that Inmates that have never had Asthma, will AT BWCI.

The black mold creates A future and current Health hazard for TT and all other inmates.

The Unit 5 shower, As of 10/5/07 is completely black with mold along the base of the shower and in corners. It will soon be spread throughout - Again.

2. Dust.

There is thick dust walls in the intake Vents, ceilings and throughout the building that further exacerbate Medical problems, coupled with the mold, and has a detrimental effect on Air circulation.

3. Rust.

Because of all of the moisture throughout the building, all Metal frames, doors, showers are Rusting and beginning to crumble. The metal framed beds are Rusting and pieces of Rusted metal stick out to cut and scrape. Rust dust particles go into the eyes, especially of the bottom bunk inmate sleeping under a Rusted bed.

4. Stair Railings.

Stair Railings that inmates with various handicaps or needs to hold onto when going up/down stairs are loose and dangerously wobbles.

5. Floors

Because of The moisture throughout the building, the floors sweat causing a slickness And danger of falls.

π
Cont

6.  **SPIDERS**

Inmates are constantly being bit by spiders that infest the building. Many inmates, including π have multiple spider bites that become infected, swollen, red and spread of infection before medical will treat them. The building, being infested with spiders, needs to be exterminated. There is no pesticide control At BWCI, therefore, inmates continue to be bitten; some more serious than others.

7.  Other Bugs + Mice

In addition to spiders, there are KNATS and water bugs (Beetles) all over the building that are in the cells, food service and medical Infirmary area. Ants infest any area with open food. Mice are throughout building and More so in Kitchen area.

8.  Shower Bugs

In the drain area there is a black shell type of bug that comes up from the drainage area, along with a flying Knat around the drains, worms have been seen in the drainage area.

9. <u>Showers</u>

The shower ceilings have mold that drips on inmates and causes "Sores". There is Rust and mold all along the shower wall. There is No drainage in floor and slow drainage in the shower. Water stands still, so that by 10-12th in line the water comes up <u>over</u> the shower shoes- exposing inmates to other inmates bodily fluids and/or other bacteria from standing water; Creating A health Risk of spread of bacterial infections. Health Inspector immediately referred to showers as "unacceptable", but Nothing gets done.

10. <u>MRSA</u>

Inmates spread what is suspected of being MRSA, but without Question is A bacterial infection, being spread through oozing sores, Contact, and blamed on Spider bites. These open sores are exposed by inmates working on Food service line, by inmates going into showers and leaving bacteria in standing water, etc. II currently has an unknown Bacterial infection on her Skin that Medical has not officially defined. At Least 20 inmates At BWCI have the same.

11. <u>HIV + Hepatitis</u>

Inmates with Blood bourne diseases work in Foodservice. Although discrimination is prohibited, In a prison setting there CAN + IS certain vindictiveness that could create A Safety hazard to future health-

II   Con't

12. SAFETY LOCKS

Because of overcrowding, inmates are now placed into Rooms without Automatic door locks. Regular cell's are controlled by a electrical Panel that locks/unlocks doors, and in the event of AN emergency CAN all be unlocked at one time.

Since inmates are now sleeping in closets, offices and meeting rooms they have to be "Key" locked/unlocked. There are times when the officer cannot find the right Key or the door lock does not properly work. JUst last week, it took two Correctional officers Almost AN hour twice to open the door of TI's Room. In the meantime TI and her roommate were locked in, Needing to use BAthroom. There is A SAfety hazard for emergency Reasons, and therefore inmates are in danger by Not being able to quickly exit.

13. NO Running WATER/Toilet facility in make shift Cells

The new, make shift cells have no bathroom facility, and Inmates are Required to share with up to 30 other inmates A common toilet area. However, inmates are frequently locked into the new make shift Cells and are unable to use Bathroom, until the C/o decides it is OK, or hears the knock to get out.

14. <u>Ventilation is inadequate</u>

Inmates are forced to breath recycled air at the most. Many rooms (at least 1/2) do not have proper ventilation. Intake vents are clogged with several inches of dust balls/lint and mold! At all times only at least 1/2 of the vents flow properly. In "A" Hall units, each pod has two sides — one side will put out warm air while the other side puts out cold air. There is never an even balance.

15. <u>MEDICAL EQUIPMENT - Denial</u>

TT has Respiratory illness (C.O.P.D.; Pulmonary Also Sleep Apnea Fibrosis; Asthma and Bronchitis) — medical has issued to her a C-PAP machine which requires an electrical outlet next to her bed and a fan is required for proper respiration due to improper ventilation. The fan memo was issued about a month ago, and given to shift commander— Capt Repetti, who in turn gave to Warden Ryan for issuance of a fan. With the lack of fresh air, improper ventilation and the heat soon to be turned on, TT is in serious medical need of the fan. The Warden fails to respond to this need, although he has several fans in stock and many other inmates have had no problem getting one. TT believes this to be in furtherance of the Administrations Common Retaliatory behavior against TT Johnson.

16) Ceiling Tiles from drop ceilings are crumbling, falling down, broken and harbor spiders that eventually come down and bite inmates.

17) Cleaning Supplies consist of Aerosols that tend to exacerbate inmates Respiratory illnesses And do NOT fall within environmental friendly consistent products.

18) Laundry Facilities are within the units and do not have proper Ventilation to Remove lint and heat from dryers. Washers and Dryers are NOT made for Amount of laundry Created by overcrowding & inmate population.

19) Worms In Shower
   on Thursday October 4, 2007 and Wednesday Oct 3, 2007 I was Asked to look at Something in the Unit 5 Shower. There were tiny little worms crawling around outside of the drain and among the Shower floor. There were also little round hard Shell type bug or snail like Insects in the drain.

20) Inadequate Shower Drainage
   The water doesn't drain properly and it causes about ½ to 1" of water that lays still during shower time And by the 10th or 12th person the water comes up over Shower Shoes creating An unsanitary environment + concern of Bacteria Spread.

B. Food Service / Dietary Needs

The B.W.C.I. Food Service area does not provide a nutritionally Adequate or sanitary diet. There is A lack of Nutritional content, fresh fruits and vegtables, dairy products. Women, specifically, Require certain portions of milk/Vitamin D — yet Receive ½ pt. At A time. Menu's are prepared and posted, but rarely followed. Women suffer nutritional deficiencies, while gaining Excessive and Rapid weight put on by 3-7 slices of bread And high starch diets.

Diet trays are inconsistent with Dietary Needs, whether Religious, Diabetic, allergy, etc.

Diabetics are served canned/sweetened with corn syrup fruits, several (3-5 slices) of bread, large servings of PASTA, etc.

Women coming to BWCI have a Rapid weight gain of 20-50 #'s in 1st 1-3 months because of unhealthy dietary/servings And lack of exercise (High starch diet).

The Rapid weight gain has a severe affect on Womens health; specifically contributing to heart disease, cancer and other illnesses. Strokes → Heart Attacks are common among inmates serving substantial periods of incarceration.

II  Corr

C. LACK of Exercise

Inmates are NOT provided exercise time, equipment, or gymnasium time. In Wilson v. Seiter, 501 U.S. 294, 304, 11 S. CT 2321, 2327, 115 L.Ed 2d 271, 283 (1991); Perkins v. Kan Dep't of Corr, 165 F.3d 803, 810 (10th Cir 1999)(holding allegation of prolonged denial of outdoor exercise could violate the 8th Amend).

Women Inmates come to prison and get fat, but men go to prison and get buffed.

Breakfast is served between 5 - 6:30 Am And immediately afterwards the women are locked back into cells, where there is no room or anything else to do, but go back to bed.

Lunch, again leaves inmates locked back in without opportunity to exercise or move around, Sometimes, and quite often - until Dinner.

Dinner is served At 4:45-6:30 pm, and again the women are locked back into cells, where again the weight turns to fat and cardiovascular circulation turns to clogged arteries and high cholesterol.

There is a large gymnasium that has No exercise use whatsoever. The only use for the gym is church services.

C.  Cont

During the warm weather months, there is an outside Recreation of 1-3 hours per week. Usually only on weekends, weather permitting. Once the time changes, there is no longer an outofdoors Recreational time. The pods / Housing units whereas the women are housed do not create an adequate space or environment for exercise or recreation. "Recreation Time", As defined by the BWCI Administrative staff is that the inmates are permitted to leave their cell and sit in another room, just outside the cell, considered the pod. Talking must be kept to A whisper or "Rec Time" will be immediately cut-short. Any Correctional officer at any time is authorized to "take Rec", for whatever reason he or she may use as an excuse.

The lack of exercise, exercise equipment, exercise space or exercise programs At the Womens Prison is A unhealthy environment that has the tendency to create long term cardiovascular, Muscular or other Medical Deficiencies. These effects are/can be defeimental to aging, pregnant and women with Medical problems.

Men Prisoners in DCC, et al have A TRACK to WAlk/Run/Jog AND weights. Women have 2 Basketball nets that cannot be used because of Church Services.

## D. OVERCROWDING

The Baylor Womens Prison was built to house 200-250 inmates at most. At last count, there are 465 inmates at the Womens Prison. Women now sleep in areas, not designed for housing. In particular — A Room, once used as a linen Closet in each unit, now houses 2-4 inmates. The Closet area does not provide proper ventilation nor does it have Running water and toilet facility. Additionally, these non conforming closets and Rooms are "Key" operated, further creating a fire Hazard.

Other Matters caused by overcrowding includes less Recreation time, speedier meal times and longer wait times for Medical treatment.

Because of having a large number of women placed into Small areas without Adequate Access to outside areas, there is further threats of violence and tension.

Staff can no longer protect inmates Adequately from assult because of over crowding and long lock in times.

### E.    RETALIATION by Staff

AT BUCI Inmates that file A grievance or fight for their constitutional Rights are quickly labeled A "trouble maker." Along with this label, comes harassment and Ridicule by various Staff members. An inmate willing to carry through with the constitutional Administrative Remedy procedures, must have a strong enough personality and "thick skinned" enough to be able to tolerate the multiple Retaliatory Acts by Staff.

1. An Inmate that spoke to commissioner, Dept. of Corrections, CARL Danberg was—within 24 hours after talking to him regarding inappropriate Administrative Procedures — was moved to 23/1 MAx security, Removed from Education Programs and terminated from Institution employment.

2. An inmate that is in "end stages" of COPD, filed a grievance against Medical for improper tx with certain medications — During the winter months with full blown heat pouring into her cell — Her fan was Removed (Although medically prescribed) until she withdrew her grievance & Had her family Stop calling Inst.

* AT This time, TI is leaving out specific identifications of inmates out of concern for their Well-being as inmates * Names will be made available upon guarantee of No further Retaliation *

3. An inmate with A personality conflict with the Warden and lead Treatment Services Person (Shotzburger) is forced to Remain in max Security lock-down, No work/employment or programs outside unit for "security concerns" - yet she has NO Disciplinary convictions or behavioral adjustments Necessary to warrant such high stringent security measures. All she has, is A lawyer that contacted the institution regarding A constitutional matter of her incarceration Adjustment.

4. An inmate that filed a grievance (not π) against C/o Hicks was labeled a "Snitch" to the inmates by C/o Hicks And therefore created a "bad" and possible dangerous situation in the institution.

5. π has been Restricted from the Law Library Because of filing grievances + sending complaints to Dept of Corr Commissioner. Furthermore, she Must Remain in max security housing and may not obtain Institutional Employment.

E.

6.   C+T Transport

Cpl Brown

Inmates transported to And From Court are taken by A State Division Within the Dept of Corrections, titled C+T Transport. The Court trips From BWCI to Dover/Georgetown have A Cpl Brown that is in charge of that leg of the operation. Cpl Brown has A tendency to treat inmates with high disregard for their Constitutional Rights. She places leg shackles on too loose, intentionally, so as to cause the Steel shackle to bang onto the ankle bone creating bruising and discomfort (severe pain). She further puts the waist chain into the hand cuff and Black box so tight that when the prisoner sits down it tightens onto the belly, and creates Serious pain for the van ride to/from Court. The worst part of the ordeal is always the handcuffs! Cpl Brown places the hand cuffs So tight that virtually every inmate that is cuffed by her ends up with bruising and Indentations with dark red marks on the wrist.

II Con't E.

6. Con't.

In July 2006 while transporting π Johnson from Dover, Kent County Courthouse, back to BWCI Cpl Brown placed Restraints on π that was so tight and huet so bad, she could not move. Cpl Brown told π, when she complained of the tightness, that she had "Something for Joni Johnson". (more staff Retaliation).

Cpl Brown jerked the handcuffs over π's wrist bone causing immediate excrutiating pain. π's wrist immediately began to swell and discobr.

When π Returned to BWCI A Nurse immediately examined and ordered A wrist support pending x RAy.

An xray ultimately Revealed that Δ's wrist had been cracked by the sadistical infliction of painful injury by Cpl Brown.

π's complaints have gone unanswered. Furthermore, when again transported in 2007 to Kent County Court π was treated Retaliatory not only by Cpl Brown, but Also by her superiors and Sgt. Porter by telling A van full of inmates About π's criminal charges and making innuendo of predjudicial treatment Accordingly.

F. **Potential of Violence caused by or carried out by staff**

1. TI witnessed two staff members, busy playing video games on the work computer and not doing their job. TI became angry and wrote a grievance alleging that "[she] has more sense than Hicks + Richie put together". The issue with C/o Richardson is long settled. However, C/o Hicks was unable to accept such a statement by "an inmate" (inferior) — The next week C/o Hicks came to the locked door of TI Johnson and poking his finger at the door in a quick threatening action, said "Do you think you are smarter than me — Huh - Huh - Do you - Do you think you are smarter than me?" Inmate Johnson, responded with "Well, I'm not the one poking glass!" That set him off, and he, becoming enraged, threatened to "take care of this".

TI was roommates with a seriously mentally ill inmate, that had just 2 days earlier come from the Delaware Psychiatric Center. The mental illnesses that TI's roommate had, that she was aware of, included multiple Personality Disorder. (one of her alter ego's was that of a "gangster"). C/o Hicks went to his desk (in anger) and called out the roommate to tell her not to believe anything TI says — And — Her told her TI had "snitched" on another (gangster type) inmate earlier that day.

II. F. Con't

He (C/o Hicks) then gave the MPD Roommate A cup of bleach, that she apparently heated in the microwave because it was steaming from the cup. TT knows for A fact that C/o Hicks Did give her the bleach, because she was the only other person out of her cell with him being the only C/o on duty. She came into the cell and locked in with the bleach, which is A product locked up and distributed only to Authorized inmate laundry personnel. (The MPD R/m was not among the Authorized inmates to have such a dangerous chemical AS INDUSTRIAL BLEACH).

C/o Hicks sat At his desk, looking up into TT's cell and when he saw TT look out the glass at him, and to verify that nobody else was out - He "Smiled" up at her.

The MPD R/m then informed TT that C/o Hicks had provided her with the chemical, and further that whatever happens once we are "locked in", he has no control of, and if he does not "See" her throw the heated chemical in TT's face - nothing can happen to her. This being after he lied And told Her that TT had been Snitching on her "gangster friend" that morning. This 18 year old, mentally ill, seriously violent Im, was Easily manipulated by This grown man.

As what can and does happen with Inmates that suffer such mental illness, the Roommate would come in and out of her "RANT" state of mind. By the next shift, she had begun to calm down and TT witnessed her switch to one personality that would lay on her back and openly/loudly masterbate, then switch to a small crying child. It was a very frightening experience.

On the 4-12 shift, Captain Snead was the officer, and TT begged her to move her out of the Room. Capt Snead said she would do that, "later." Through that night TT went through ups and downs with the Roommate coming in and out of different mind states. 24 Hours later, c/o Davis came on the 4-12 shift, and he finally, saw what TT was going through and He keyed open the door, grabbed TT by the arm, and pulled her out of the cell, leaving behind the Roommate and all of her property.

Later that evening, c/o Davis took TT to the Room, with two other inmates, to get her property. When c/o Davis key opened the door, the MPD Rlm threw all of TT's belongings outside — But SHE very carefully handed her The CPAP Machine. c/o Davis told TT to spend the night in Dorm, and he would have 8-4 shift move her the Next Day.

π set up her bed in the Dorm, and Discovered the MPD R/m had eaten all of π's Commissary items. Then π plugged up CPAP, and turned it on to check if in case any water had backed up in Condenser. Immediately upon turning on the machine, π smelled the Bleach. Apparently, The MPD R/m had put the cup of bleach in the Water Resevoir. Had π put the mask on first, as normal, then turned on the machine, it could have Killed π, in the least caused serious injury And/or Blindness. This has been a cause for π to have serious sleep deprivation and fear. π went to staff and spent hours, And lots of Distilled water cleaning the machine. Staff said Nothing could be done about her, because Nobody saw her do it. (Yet she admitted it, and bragged About it in front of the whole Unit).

π wrote to Internal Affairs, Warden, Commissioner and Bureau chief At least 3 times each and Has Never once Received a Response. The Inmate Remained on the same unit with π and C/o Hicks Continued to work the unit. π spoke to Capt. Repetti, Capt. snead, LT smith and CPL woodson about problems with the inmate, and C/o Hicks.
Yet Neither π, Nor her were separated until at least a month later. The MPD I/m continued to threaten and torment π to no Avail.

π filed multiple grievances and wrote letters about the problems with the Im and further Actions by C/o Hicks. Nothing was ever done or addressed. Eventually, the Im MPD left the prison, and the matter wasted Away. Last week the Im MPD Returned to WCI on A V.o.P. and was again put in unit with π. She Left 2 days later.

C/o Hicks has made A practice of causing Im π Joni Johnson problems in the prison. He has threatened her with Disciplinary punishment, knowing she had done nothing wrong and stating — "who will they believe?". He has indicated that π has "Mental problems" and is making up the stories — which had they been investigated and witnessed Asked — All would have been verified that he did, in fact, do the things π alleges. C/o Hicks has labeled π prejudice and as a snitch in the prison. He again caused π A problem when she had a personality clash with a bunkmate that was angry over the "Noise" made by π's CPAP and she told C/o Hicks that she wanted the "old woman" (π) out of the room or she would "cut her cord" to stop the noise of the CPAP Respiratory equipment, that π must use to sleep.

C/o Hicks said He could not Do anything About it, unless or until she Actually does something. He did hear her make the threat. Later that day, TT had COPD Exacerbation and was Rushed to Cheistiana Hospital, where she Remained a patient for 5 days. When TT Returned to WCI she learned that C/o Hicks allowed the threatening inmate to "help herself" to TT's property — including personal clothing and commissary items. TT has never gotten these items back, and has been told by 11 witnesses what happened. Again — Staff Does Nothing.

Further more, the Hose on TT's CPAP Had been cut, just as the Im told C/o Hicks she was going to Do — And Again — Nothing has happened.

The Administration Refuses to address or even investigate the allegations about C/o Hicks. He continues to make Retaliatory comments, Rude innuendo's and talk about TT to other inmates and staff members. At this point — Everyone pretty much knows what he is doing, but they ignore it; except New comers — they listen.

* TT is not the only Im that has had those problems with C/o Hicks, and they too are ignored *

II. F. Cont

The most recent incident with C/o Hicks, involving II is when II was a patient in Christiana Hospital, July 2007. All twenty-four hour periods of "Hospital Duty" require two C/o's to be present to "watch" hospitalized inmates. These hours are done by "over time" officers only. A particular Night C/o Antonio and C/o Hicks were assigned to II on 12-8 am shift. C/o Antonio, knowing there is friction between II + C/o Hicks - agreed that he would hold the foot-cuff key and Hicks would hold the gun. (Cannot be done by same C/o - the C/o touching I/m cannot hold gun for security reasons). Hicks came in at 12:00, walked past II's bed to the window, put on the gun, and turned his chair facing the window - away from the door + II. He then propped his feet up on the wall and fell asleep. Back and gun to II and door. C/o Hicks slept 7 out of the 8 hours and snored so loud II could not sleep (coupled w/ the discomfort of him being there) - He woke up one time - when C/o Antonio had to leave the room for a few minutes. This one time he lifted his chair to slam it on the floor / startling II (a respiratory + cardiac patient), he closed the door and he walked over by II's bed - looking at her in an intimidating fashion and turned the heat on 85° - July !

## G.   FIRE HAZARDS

Although the building is set in a way that any fire would be considered "contained", there is No Reality Fire Prevention In The Bucei. "A" Hall, which is considered Maximum Security, Does NOT Have A Fire Hose Any longer. It was Removed, for an unknown Reason, and has Never been Replaced.

The New "make shift" Rooms Do not have Sprinkler set-ups. The Sprinklers are over Plumbing doors, outside of cells.

The procedure for inmate emergency evacuation is for the inmates to go into the Gymnasium. A Room not large enough to hold all of the population. During fire drills, one unit at a time is taken to the gym And Returned to the unit before the Next unit goes. Not consistent with true emergency procedural Needs.

The only place a fire would Really be considered dangerous, would be in the ceiling area, and even if Contained will smoke damage and suffocate/fill the gymnasium. Although Inmates would not Burn, the smoke would over power.

## H.   STAFF Misconduct

### 1.   Violence towards inmates - capstun

What has become common practice is the use of cap-stun (mace) without full justification or need. c/o's now threaten inmates with being capstun sprayed for minor infractions that are most always the result of a c/o losing his temper.

It is a known and undisputed fact that inmates, especially females, quite often will become "mouthy". More times than I can remember an inmate has decided to argue with or make hurtful comments to staff in an attempt to generate a reaction. What staff now does in these situations is pull out the cap-stun can.

The D.O.C. policy for use of cap-stun is that it will only be used to subdue an out of control inmate / situation. It is not to be used as a threat or as a punishment.

Any time a staff member uses capstun there must be a log, a superior officer called AND a report filed. None of this is done.

* The amount of times this has happened cannot even be counted *

II Con't

H. con't

2. While on unit 8, a group of inmates became out of control one night and held what has been defined a "situation possibly Riotous". An 18 year old girl, fresh from Stevenson Juvenile facility was in her cell, and became enraged. She had somehow gotten a broom in her cell with her and began trying to break out the plexiglass door window. She did crack it, and П witnessed Three grown men correctional officers pull the door window out, and reach 3 arms inside of the cell, and empty 3 cans of capstun on the 18 year old girl. There is no doubt she had gotten out of control and required some sort of Action. Three grown men emptying capstun on her, in her cell, then cuffing her and dragging her down the steps to an isolation cell was more force than necessary. Capstun is only Suppose to be used, just enough to force the inmate into submission. As a consequence, A medical emergency had to be called, because she stopped breathing.

3. A handicapped inmate, paralyzed on one side, having recently suffered a stroke went to A C/o to Request to be sent to medical, because of her blood pressure, he responded by spraying her.

4) Doc staff spends most of the day on the internet.

Inmates are now left unattended by a large percent of the unit officers because they spend most of the shift on the internet. The most common practice now is for them to study for or take internet tests in their professional capacity for the purpose of gaining pay increases and/or points towards higher rank. Because of the officers attention being so focused on the computer, inmates become free to roam the unit, sneak into areas not authorized, create violent acts, steal and/or anything else so desired.

This has the potential to create loss of property and/or dangers to inmates.

5. Officer Warren made a joke of π by dragging his leg across the floor to immitate/mock her handicap leg when she asked him to write a work order for loose stair railings.

6.) Officers are unconcerned about the possibility of having a grievance filed against them, because their superiors to nothing to Repermand or correct unprofessional and inappropriate behaviors.

The BWCI has a large amount of mentally Ill inmates that are housed together, but do not Receive the necessary treatments. Although there is one unit, The Harbor House, that is designed for inmates with mental Health issues, it is not equipped to handle the More serious problems. Inmates with multiple Personality Disorder, Manic, Depression, Serious Anxiety are all grouped with the minor disorders controlled by Medication and behavioral modification.

TI was housed in a locked cell with a Known violent Mentally ill inmate with mPD and other Mental Health issues. This almost cost TI her life, her face and/or her eyesight. Such inmates should be housed at Del State Hosp in the "Criminally insane" Section.

"The mentally ill inmates do not Receive Psychiatrist care at BWCI, other than once every 3 months they are prescribed and prescriptions Renewed medications. Furthermore, many of these mentally ill inmates will spit out the medications and staff ignores it until A violent attack by one of these inmates.

IV

# Denial of Religious Freedoms

The 1st Amendment to the United States Constitution is A Religious Freedom protection that further extends to Prisoners as well as free Citizens.

Inmates ARe denied their Constitutional Right to free practice of Religion by disallowing certain Inmates to attend Church services. Certain Corrections staff may at any time, without Due Process or evidence of wrong doing, just on A whim — may deny an inmate the Right to attend Religious Services.

It has become common practice now for an officer to take Away the Right to attend church. Inmates are actually being given Disciplinary Reports and sanctions of NO church.

 * A particular inmate on unit 5 is NOT permitted church services and has never been told why — she has An Administrative Action filed with Commissioner at this time.

 * Unit 8 inmates have been permanently denied Religious Access. Unit 8 consists of 23/1 Disciplinary and overflow population.

 * Christianity + Muslim are only 2 allowed Religions AT BWCI.

Toni Johnson
# 00182823 Unit 5
Baylor Womens Correctional Inst.
660 Baylor Blvd
New CASTIe, De 19720





United States District Court
@44 King St
Wilmington, De 19801

Inmate
Legal Mail