The United States District Court
for The District of Delaware

Joni L. Johnson
Plaintiff π

v.

Joseph Biden III, Attorney General
Commissioner CARL Danberg, D.O.C.
Bureau Chief Rick Kearney, B.O.P
Warden PATRICK Ryan, BWCI
Colleen Shotzburger, Ms. Russell
And George O'Connor, Δ's Defendants

Civil Action No. 07-394-GMS




First Amended Complaint

Plaintiff, Joni L. Johnson (hereinafter π) Appearing in pro se brings this First Amended Complaint in the nature of A Civil Rights Action by A State Prison inmate pursuant to 42 USC § 1983 And the United States Constitution Seeking compensatory and punitive damages, As well as Injunctive Relief, for Adverse Actions taken Against π in violation of her Constitutional Rights And in Retaliation for exercising her constitutional Right of Access to the Courts, Due Process, Religious Freedoms, conditions of confinement, verbal And excessive force claims And for filing of grievances up through And including Requests For intervention by the Commissioner of The Department of Corrections And intervention by The United States District Court, The Honorable Gregory M. Sleet, Chief United States District Judge.

I. BAckGround

Initially The Court has ~~granted to~~ changed the caption of the complaint to change the name of Δ Joseph Biden Jr to Joseph Biden III, Del Atty General,

Secondly, the π will Note that upon initial review pursuant to 28 USC § 1915 screening process, the Court has <u>Dismissed</u> as Δ's the following: Attorney General Biden, Bureau Chief Kearney, Ms. Russell of Treatment Services And George O'Connor, Law Librarian At <u>BWCI</u>.

Thirdly, π Notes that This Honorable Court has included as Δ's Cpl. Brown of C+T Transport And C/O Anthony Hicks, BWCI Correctional Officer. The Court Notes that the Δ's List of other Δ's has Not been Received into the record. This brings to π A concern that perhaps "other" items have Not been received by The Court As well. * At the time π mailed to This Honorable Court the "Amended complaint with supplement", π recalls having An issue with The mail Room Not sending out the envelope. The first time it was placed in the mail bag, π Received it back stating that it weighed over the postal limits And therefore would only be Accepted by personal delivery to the post office; π then broke the one large envelope down into 3 separate envelopes with a Note to the Court Clerk of why. Over the Next two weeks At one time or another these envelopes Again were Returned to Johnson for "ADDitional Postage". One envelope Returned because it was Not captioned, however, being 1 of 3 that presumably had arrived At the same time - π did Not see the Need for individual captioning. π subsequently Re-stamped the 3 envelopes And Returned them to the Prison Mail Box Depository - <u>Assuming</u> All had eventually arrived. Within the 3 envelopes, π had included further indepth detail As A Supplement to the Skeleton filing of 42 USC § 1983 to support her claims, along with Additional Staff members that would be Included with the VARIOUS issues π Requests This Honorable Court to Address or Review. π will Not send the supplemental information to determine which part the Court <u>did Not receive</u> until or unless the Court Requests it, And π further Needs to photocopy it once Law Library reopens After Xmas.

During the initial Screening pursuant to 42 USC §1983 And The Standard of Review pursuant to 28 USC §1915A, with the Standard applicable to a Motion To Dismiss Under Fed. R. Civ. P. 12(b)(6). Fullman v. Pennsylvania Dep't of CORR., No. 4:07CV-000079, 2007 WL 257617 (M.D. Pa. Jan. 25, 2007), This Honorable Court Dismissed the Access to the Courts claim "for failure to state a claim upon which relief may be granted": Π Will Acknowledge To This Honorable Court that the Law Library issue is A Well settled matter, And that Δ George O'Connor has been pleasantly cooperative in Assisting Π with Needed Research and Document preparation time, photo copies and Any other assistance permitted Within the Guidelines of his position. He not only honored the Court ordered hours but Alotted Π Additional preparation time. Therefore Π has No further requests for consideration in the Access To The Courts Issue.

Other issues dismissed by This Court include The Due Process claim; Housing/Cell Assignments; Religion Freedoms; Grievances; Internet use; Verbal Abuse, Dismissed without prejudice And for failure to state a claim upon which relief May be Granted pursuant to 28 USC § 1915 (e)(2)(B) and 1915A(b)(1).

Regarding the Retaliation issues the Court dismissed for "Lack of Standing" the "other retaliatory acts, none of which were directed towards plaintiff"; however, Granted Leave To Proceed on the Retaliation claims Against C/O Hicks for "Several Acts of Retaliation by Hicks following a grievance she filed against him"; Cpl. Brown and her superior Sgt. Porter "innuendo of prejudicial treatment" And false Accusations by Warden Ryan And Shotzburger, which also involves Danberg.

Furthermore, Π Alleges An Excessive Force Claim against C&T Transport (Dover) Cpl. Brown (As A DOC employee), Whereas She Deliberately And without provocation bestowed excessive force Against Π, causing Injury, pain And swelling, unnecessarily.

The Court indicates that "Johnson has adequately stated an excessive force claim against Brown", but dismissed the generic use of cap-stun force "used against other inmates At BWCI." Therefore, allowing π Leave to proceed on her claim against Brown, but dismissing the generic cap-stun force claim.

π does Admit And Agree with the Court that several of the stated issues in the "Amended complaint" Are either frivolous And/or fail to "state a claim upon which Relief may be granted." Johnson listed various generic issues within her filing(s) to give the Court An oversight of typical behaviors by D.O.C. Staff And Administration. Initially, several inmates Approached π regarding A "Class Action" - Civil Rights Suit." Therefore, π included issues that also affect the full inmate population. Upon careful Review and consideration, with Research, π has determined that there is in fact A portion of the Amended complaint And/or supplemental Proceeding that is in fact part of the "Lost mail" incident that the Court has not received And is therefore unaware of The Possibility of A class Action.

The final matter is in Regards to The Conditions of Confinement that π initially alleges Amount to Cruel And unusual punishment, An 8th Amendment Protection. The Courts order of November 26, 2007 "notes that Johnson does not have standing for many of the conditions she raises. Also, the amended complaint fails to allege who is responsible for the alleged conditions of confinement." The Court, therefore, recognizing that various conditions of confinement, As they directly Affect π Are cognizable, And "Plaintiff, however, will be given lead to amend said claims". "The first amended complaint shall be filed within 30 days from the date of this order." The November 26, 2007 order is due December 26, 2007.

This First Amended Complaint is therefore timely

## Parties

1. Π is a Citizen of the United States, and, at all times relevant to the events described in this First Amended Complaint, is an inmate with The Delaware Department of Corrections And the Delores J. Baylor Womens Correctional Institution, (The DOC AND BWCI) At 660 Baylor BLVD., New castle, DElAware 19720, New castle County.

2. At All times relevant to the events described in this First Amended Complaint, As Well As in the Initial Request for Injunctive Relief And Modified complaint, CARL Danberg was employed by The State of Delaware, Department of Corrections, As Commissioner And is responsible for the Compliance of all DelAware D.O.C. Institutions And Staff, with The United states And Delaware Constitution AND Laws, which further include the policies At The B.W.C.I., and the conditions of the buildings inmates are confined in.

3. At All times relevant to the events described in this First Amended Complaint, As well as in the initial filings for Preliminary Injunctive Relief And Modified complaint, Δ PAtRick Ryan was employed by the D.O.C. As Warden, BWCI, and is responsible for the day to day operations and Conditions At BWCI.

4. At All times relevant to the events described in this First Amended Complaint, As well as in the initial filings for Preliminary Injunctive Relief And Modified complaint, Δ Colleen Shotzburger was employed by The D.O.C. AS Treatment Services Administrator At B.W.C.I., and is responsible for the classification of inmates, including that of Π Joni Johnson.

5. At All times relevant to the events described in this First Amended Complaint, As well as the initial filings

Anthony Hicks, Correctional Officer At B.W.C.I. was employed by D.O.C., State of Delaware and is Assigned to specific security posts throughout the prison as determined by the Scheduling Administrator, which include Housing units of the π.

6. At All times Relevant to the events described in this First Amended Complaint, As well as in the initial filings, Corporal / Ms. Brown was employed by The Delaware Department of Corrections in the Court And Transport (C+T) Division as A Transport Corrections Officer and Responsible for transporting π, And All other Kent/Sussex County Female offenders to And from the prison And courts within the State of Delaware jurisdiction.

7. At all times relevant to the events described in this First Amended Complaint, Δ's were employed by the Department of Corrections And Acting under Color of the law of The State of Delaware.

## Jurisdiction And Venue

8. This Court has jurisdiction of π's claims pursuant to 28 U.S.C. §§ 1331 And 1343 (a)(3), (4).

9. All of the acts, events, transactions, and occurrences giving rise to this First Amended Complaint, the initial filing for Preliminary Injunction and Modified complaint under 42 USC § 1983, occurred in this District, within The State of DELAWARE.

## Facts Common To The Counts

10. π has been in Continuos custody of The Delaware Department of Corrections, B.W.C.I. since March 15, 2007.

11. π was in custody of The Delaware Department of Correction At BWCI for Approximately 2-2½ weeks of July 2006, At which time the initial Excessive Force took place by CPL Brown - C+T Transport - while returning Johnson to the B.W.C.I. following A Court Appearance in Kent County. CpL Brown has further acted With Retaliatory And Excessive Force Actions that fall under the Deliberate Indifference Standard that have continued to escalate while π has been incarcerated since March 15, 2007, with out-of-state Credit back to March 2, 2007 (Nevada).

12. π has been in Continuous custody At B.W.C.I /DOC. Since March 15, 2007 whereas she has come to Know Corrections Officer Anthony Hicks, And on times Specific to the Retaliatory Acts Against π Joni Johnson, specifically Aimed At her In an attempt to intimidate, threaten And/or punish by causing with Malice intent harm And/or injury Specific Actions that under Supervision of BWCI Administration (Warden Ryan, Shotzburger + Commissioner Danberg), has been in the Custody of the DOC.

13. At All times relevant to the conditions of Confinement, of which This Honorable Court has granted leave to Amend the Complaint with more Specific details of the condition, the injury, + the responsible party, which must be included in π's First Amended Complaint, within 30 days of the November 26, 2007 entering of the order, π Joni Johnson has been in continuous custody of The Delaware D.O.C. At B.W.C.I. And has reported these matters to the Administration, through the Grievance process And The Conditions have Not been Addressed which is the Responsibility of The Warden and Commissioner.

14. At All times Relevant herein, Δ's Danberg, Ryan, Shotzburger, Hicks And Brown were "persons" for purposes of 42 USC §1983 And Acted under "Color of LAW" to deprive π of her constitutionally protected rights, as set forth more fully herein.

15. At All times during her incarceration At B.W.C.I. π has Not held down Institutional Employment because of medical and handicap reasons. π would only qualify for A Sedendary position or A position of A more relaxed environment.

16. π has faced and now faces A substantial and irreparable harm due to the Actions of the Δ's As set forth in the original + modified complaint and as set forth in this First Amended complaint.

17. π has faced and continues to face A substantial and irreparable harm do to the conditions of her confinement And the conditions and health And SAfety hazards of the B.W.C.I. facility, of which the D.O.C. Administration, Warden Ryan and Commissioner Danberg are Responsible to evaluate, And maintain A proper healthy SAfe environment And have failed to do so, further causing π irreperable health conditions.

18. π began using The Inmate Grievance System At B.W.C.I. in July 2006 regarding the CPL Brown Excessive Force complaint of which fell on deaf ears; AGAin beginning in April 2007 π continued with the Inmate Grievance process regarding continued Actions of infliction of Deliberate pain And injury on Court Runs by Cpl. Brown - deliberately directed with malicious intent towards π. Grievances remain unanswered.

19. In April 2007 (Chronology As AB/Exhibit) π came to Know Δ Hicks on Unit 8, maximum Security And began the inmate Grievance Process regarding multiple Acts of Retaliatory behavior directly by Δ Hicks, directly At π Johnson.

20. π Again began the inmate Grievance process to resolve the retaliatory And irreparable harm caused to π by Δ Hicks, which fell on deaf ears by his superiors, Δ's Shotzburger, Ryan and Danberg.

21. As A result of Δ's Shotzburger, Ryan and Danberg's failure to respond and correct the behaviors of officer Hicks, the Retaliations escalated further causing π to face further irreparable harm.

22. As A result of Δ's Shotzburger, Ryan and Danberg to disregard the Actions of Cpl. Brown and C/o Hicks, π Johnson remains in continuous danger of further injury, both physical And Emotional, caused by Hicks And/or Brown by remaining in a position of custodial Control of π.

23. Δ's Warden Ryan + Shotzburger continue to make Arbitrary Rules And Infractions that are Not part of the DOC or BWCI Policy, and which are directed Strictly At π Johnson without justification other than Retaliation of which create an environment of uncertainty, distress And Ambiguity without cause.

24. Δ Danberg has been contacted by π regarding the Arbitrary And capricious Actions of Δ's Ryan and Shotzburger, as well as Hicks And Brown, but he Continues to ignore his Ultimate Responsibility to protect π And oversee his staff.

25. Δ's Ryan, Shotzburger And Danberg have falsely Accused π of Rules violations, and carried through with sanctions to punish without Due Process.

26. Δ's Ryan and ~~Johnson~~ Shotzburger punitively sanctioned π to maximum security housing based on the false accusation of A Rules violation in retaliation for exercising her first Amendment Right of free speech and 6th Amendment Access to the courts.

27. In April 2007 Correctional officers under Δ Ryan's Control And Direction searched π's room for any "paperwork" regarding possible Civil Rights Actions that π "MAY" be working on Against The D.O.C. π's Legal Documents were reviewed After being confiscated then replaced to π.

28. Despite π's repeated requests for staff intervention by Δ's Shotzburger, Ryan And Danberg to resolve the Retaliatory And Excessive force complaints directed At π by Brown And Hicks, c/o Hicks WAS permitted to continue watch over Johnson, And Brown WAS permitted to continue transporting π.

29. Δ's Actions have caused And continue to cause π Physical injury, including severe emotional Distress, Daily fear, severe headaches, Insomnia, Anxiety, depression, Heart And Respiratory exacerbation, Return of seizures After 30 years, And broken bones, bruising, swelling And scarring.

30. Δ's Acted specifically to prevent And make it difficult, physically And emotionally, for π to complete And file the 42 USC §1983 Civil Rights Complaint in this Court, and to Hinder Response Deadlines And orders by this Court.

First Amended Complaint page 11

31. As A result of Δ's Actions, π has been subjected to physical threats And verbal Abuse by other C/O And D.O.C. Staff, Not included in this Action, that have Resulted iN π being in fear of physical harm And suffocation by Inmates And staff based on direct Actions by Δ's

32. Δ's failed to investigate properly And/or cause to be investigated properly π's Allegations of Retaliation And Rights Violations, despite being placed on Notice by π of the constitutional Violations described herein.

33. Δ's failed to Supervise properly BWCI personnel to prevent BWCI And DOC personnel from retaliating against inmates, including π, for seeking relief in this Court; of which Retaliatory Actions continue against π up through + including today. (see chronology of events w/dates)

34. Δ's Ryan and Shotzburger, with the Approval of Δ Danberg have placed π in A Housing unit specifically designed And for the sole purpose of hindering π's communication with inmate population After learning that several members of the General Population had Approached π About Assisting in Various issues from staff misconduct, Civil Rights Violations, excessive Force And Due Process plus Religious Freedom violations. Many of the inmates Approached π regarding the possibility of A class Action.

35. π hereby incorporates into this First Amended Complaint All original filings And Documents including the supplemental documents, Along with the individulized statements of fact And chronologies.

Count I

Pursuant to 42 USC § 1983 for Declaratory Relief And Damages for violation of Plaintiff's Right to be free from cruel And unusual punishment which would otherwise violate the eighth Amendment

36. Π hereby incorporates by reference the foregoing paragraphs of this First Amended Complaint.

37. The Actions of Δ's As described herein, while Acting under color of state And/or federal law, deprived Π of the Securities, rights, privleges, liberties and immunities secured by the Constitution of the United States of America, including her right to be free from cruel And unusual punishment As guaranteed by the 8th amendment, with protections under the 1st + 14th Amendments As well.

38. Δ's have Acted intentionally, Knowingly, excessively, maliciously And/or with reckless indifference or disregard of Constitutionally protected Rights.

39. Δ's conduct violated clearly established Rights belonging to Π's, which Rights reasonable persons in Δ's position knew or should have known of.

40. As A direct And proximate result of Δ's Actions described herein, Π has suffered Not only deprivation of her Constitutional rights, but Also significant injuries And illness, damages, pain, suffering, And Respiratory Distress And losses, for which she is entitled to Redress and compensation for the permant injury sustained.

# 41. This Honorable Court granted π leave to file 1st Amended Complaint As to Conditions of Confinement within 30 days of the November 26, 2007 Memorandum And order.

42. π incorporates All of the Above into the herein first Amended Complaint And includes that:

a. The entire building(s) And inmate housing area is infested with A black slimey mold that Runs rampant through the entire Ventilation System.

b. The Air vents blowing into the housing area(s) that π lives in by order of Incarceration, And that π is mandatorily locked into by D.O.C. policy And Security procedure, from the date of her incarceration up until the current date, which has been such through All housing Areas π has been in And remains has the black slimey mold in the ventilation system blowing into And becoming the Air that π breathes. Also, Along with the black slimey mold is A mildew build up in the walls, Ceilings And most especially in the shower And bathroom areas of which π uses on A DAily basis. The problem of mold And mildew is in every single unit of the BWCI.

c. π has Researched the dangers of mold And mildew in buildings to the Respiratory System, And Discovered that According to the Mayo Clinic Studies there is A "Toxic" Affect to elderly, immune compromised And those Already experiencing respiratory illness. π has Severe Asthma, chronic Bronchitis, Chronic obstructive Pulmonary Disease (COPD), Sinus Allergies, pulmonary Fibrosis And it

has just been discovered that π Now has A "Nodule" on her left lower lobe of the Lung that is 4.3 cm x 1.6 cm. * This matter will be separately Addressed; however, π wishes this Court to Note that the existence of the Nodule was Not there in the earliest months of incarceration At BWCI As is shown by CT SCAN. π Has been hospitalized three times for C.O.P.D. Exacerbation At Christiana Hospital Since being incarcerated in March 2007. This sudden discovery of the Nodule, which may or may not be cancerous Requires Biopsy And further testing. π only learned of the Nodule on Christmas eve Morning by Dr. Donohue, CMS Physician At B.W.C.I. It was discovered by CT SCAN in August 2007 And CMS medical Staff Never reported it or followed up on it with π. *

D. π Submitted An Administrative Remedy Request Regarding the needed maintenance of Health Hazards At the BWCI (copy enclosed). By using the Administrative Remedy Appeal to Δ's Warden Ryan And Commissioner Danberg, Requesting that An Inspection be conducted And immediately begin to Address the Severe safety and health hazards At the B.W.C.I, beginning with the mold And mildew build-up that is toxic to π.

E. An inspection was ordered or Requested by either or both Δ's Ryan And Danberg.

F. on the 24 Hour period prior to the Known/Scheduled inspection, by order of what π Knows to believe, the warden, through his Administrative staff ordered the Showers closed And painted to cover the mold buildup.

G. The inmate maintenance crew, Known As "E Crew", CAme into the Housing areas, including the present area that π is housed plus the other Areas in the building And put A Coat of PAint over the dry shower walls. The Rust beams inthe ceiling were covered with paper. The mold wAs "Covered" for "the day". Within one week it had worked it's way bAck through the paint and π continues to breath the "Sick Air."

H. Δ Ryan And Δ Danberg Are responsible to Assure the SAfety And healthy environment of the π And to guarantee the Air that she breathes is not toxic And does Not create A health hazard.

I. There are clean airsteps that can be tAken to Resolve the toxic mold in the ventilAtion System, but the Δ's Will Not order the maintenance or order the equipment. Δ's Ryan And Danberg are the only ones AuthoRized to order such ARepaiR project.

J. The Dust that has built up for years And has been present for the entire time of π's StAy At BWCI And is still A concern by π for her respirAtory health, is present up through the upper walls, intAke vents Are clogged And it is mixed with the mold in the ventilAtion System that π breathes the air from, Δ's Ryan And Danberg have fAiled to Address these concerns, regardless of π's multiple pleas for clean aiR maintenance or equipment.

K. In regards to other miscellaneous health hazards that create An 8th Amendment violation And have been present throughout π's incarcerAtion until now And that have been brought to Warden Ryan And Commissioner Danberg's Attention include:

1. Spiders that π has been bitten on more than one occassion include, from her time in max Hall, A bite on each forearm that both times became infectious sores that are just now beginning to heal (3 months later). The spider infestation has been an ongoing problem at BWCI and Δ's Ryan and Danberg have failed to address multiple requests by π over the past 6 months for extermination. The extermination request not only addresses the spider infestation (other inmates are still being bit and π still is at risk for another bite), but also: *(π just bit again on the face 12/26/07)

- There are worms that come up through the shower drains after it rains
- There are rats and mice throughout the prison's housing area's
- other flying knats and water bugs that associate in Damp areas

* Δ's refuse to order extermination *

2. The showers all have a mold/fungus in every housing unit. This has been ongoing since π's incarceration, and continues til now – the water beads from the shower have fallen on π's head and shoulder. Both times a fungaii sore has formed, requiring medical treatment to cure. Again, Δ's Ryan and Danberg have failed to address and order maintenance to repair the ventilation in the bathrooms, showers, mold, mildew, exposed insulation and wet dry wall all of which create further health risks for π and her respiratory illness.

3. MRSA

Although π has Not developed A MRSA infection on her Self, the possibility is high that she can do to unsanitary exposure Conditions. The Delaware Department of Health And Safety require Reporting of MRSA infection of inmates. Furthermore, Inmates Are to be quarantined And properly treated if infected. Since π Arrived At BWCI in march 2007, Right up through today there are inmates with MRSA housed Among the population And touching Surfaces, sharing showers And bathroom facilities with π And All others. There is No Antiseptic in the building for inmates to protect themselves with. Δ's Warden Ryan And Δ Commissioner Danberg Refuse to Address the MRSA infection that exposes itself to π And others. Furthermore, it is the belief of π that Δ's have ordered the Release of the existence of MRSA At B.W.C.I. to be Stifled. Δ's Are Actually striving to "cover-up" the existence of MRSA At BWCI because of the Health & Safety REQuirements.

4. Because of the moisture in the buildings At B.W.C.I. The floors "Sweat" And become Slippery - Slick. π fell on the Slippery floor while on Unit 8 And broke her 9th Rib. The broken Rib from April 2007 Went undiagnosed until August 2007 - because π WAS complaining of pain (still) in the area. The xray that verified the broken rib from the fall only took place because DR. Ford At ChRistiANA Hospital wanted to find out why π WAS still having pain in the area. Furthermore, π has injured her Right hand of which requires surgery to Address

5. At All times Relevant to the conditions of confinement that π has included in this First Amended Complaint She was An inmate At the BWCI And Δ's Ryan And Shotzburger Were employed by The D.O.C. At B.W.C.I. And Δ Commissioner Danberg Remained the Responsible party to resolve And Assure the Constitutional Rights of π Joni Johnson.

6. All of the unsanitary and unsafe And unhealthy conditions At BWCI Are believed to play A large Affect in further debilitating the health of π by Affecting her Respiratory system, among others.

a) π WAS first Admitted to Christiana Hospital in May 2004 After being rushed from the prison by Ambulance And initially presented with Chest pain And shortness of breathe. π initially presented with Abnormal EKG's // Admitted to Hospital // By the third day the EKG had Reversed itself And π was Again breathing Normally. oxygen Levels had increased to A1 SAFE number, and π WAS Released back to BWCI. Within A few days, once Again π WAS suffering with Respiratory distress and low oxygen levels.

b.) π WAS Again Admitted for exactly the same reason in early July 2004 And Kept for 5 days. Once BACK to normal, again Released to BWCI.

c.) The third time was somewhat different, π had Returned from Christiana just A few days earlier And immediately went back into Respiratory Distress. Being Admitted for yet Another time — it WAS Determined that π ALSO Suffered A Stroke And Seizure, with hand And Rib injury from the fall.

d) All hospitalizations were for COPD Exacerbation. The last one included the Stroke As well. This may have been due to this New Growth π has just been told of on her lung, Fluid Retention because of the use of MSG in the Prison diet, or C.O.P.D. Related / whateve it is – π Starts breathing much better And Oxygen levels Return to A positive number while in hospital, but within days After once Again breathing becomes labored.

e) Medical Staff that oversaw π while At Christiana Are in agreement that the environment of π's breathing with mold, dust, fumes, inAdequate Ventilation, And Stale building moisture coupled with An already compromised respiratory system is most probably causing π the COPD exacerbations And newly discovered Pulmonary Nodule; And that the environment At the BWCI could easily be the cause of the exacerbations to worsen. They agree that these Conditions Are Able to Negatively Affect A healthy Respiratory System – π having C.O.P.D. is extremely vulnerable, and Δ's Are Responsible to maintain the building And Inmate environment, but have failed to do so.

#42 π therefore requests this Honorable Court to Allow this 42 USC § 1983 to proceed on the Conditions of Confinement Claim as it Applies to the matters Affecting π's health for the past 10 months and that it will continue to be detrimental to the future health And possible survival of the π; And that Δ's be held Responsible for Neglect of duty to maintain A healthy environment for π.

# 43 The prison conditions just listed deprive π of "the minimal civilized measure of life's Necessities." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.CT 2392 (1981). Life's Necessities (or basic human needs) identified by the Rhodes Court include "food, clothing, shelter, medical care and reasonable safety", warm, exercise and the basic elements of hygiene". (citing Helling v. McKinney 113 S.CT 2475 (1993)) (citing Deshaney v. Winnebago County 109 S.CT 998 (1989)) (Wilson v. Seiter, 111 S.CT 2321 (1991)).

# 44 Poor prison conditions Constitute An Eigth Amendment violation Also include Safety HAZARDS, And unsAnitary facilities, over crowding, And inadequate heating And Ventilation; which would include the "Sick AIR" that π breathes 24 hours per day, 7 days per week with No opportunity to leave for fresh AIR After 8 hours.

See Also Helling v. McKinney, 113 S. CT 2475, 2482 (1993) (holding that exposure to extreme levels of tobacco smoke that pose An unreasonable risk to future health may be An 8th Amendment violation, And that the π did Not Need to wait until she WAS Actually injured/harmed to ask the Court to correct unsafe conditions) (Atkinson v. Delaware Dept of Corrections, No. 99-562 JJF, 2001 U.S. Dist Lexis 25586, At *13 (D. Del. June 27, 2001). See e.g. Tillery v. Owens, 907 F. 2d 418, 427-28 (3rd CiR 1990) (holding that double celling due to overcrowding, in combination with other factors, such as the Physical Condition of the cell, violated 8th Amend).

# 45 The required showing that the listed conditions of Confinement As it relates to the building And Δ's Refusal to Address it meet the required objective And subjective test.

Count II

Pursuant to 42 USC § 1983 for Declaratory Relief And DAmages for Retaliation by Δ's with Punitive Requirements

#46 π hereby incorporates by reference the foregoing paragraphs of this First Amended complaint.

#47. π engaged in Constitutionally protected Activity by seeking Redress by Grievance And Appeal to Δ's Stotzburger, Ryan then to Danberg Against Δ's Hicks And Brown, plus other matters, As listed in "Retaliation Chronology of events" As An exhibit And with incorporation of All prior filings by π in this matter.

#48. π's constitutionally protected conduct was A substantial And motivating factor for Δ's Adverse Actions Against her.

#49 Δ's conduct caused injuries that would chill A person of ordinary firmness from Continuing to engage in such constitutionally protected Activity.

#50 Δ's Acted As described in the Retaliation claims under color of State LAW And the Constitution.

#51 By their Actions As described And Alleged in this First Amended Complaint with incorporation of All prior filings by π in this matter in retaliating Against π And/or in conspiring in and furthering such retaliation for her engaging in Constitutionally protected Activities, Δ's violated π's First, Eighth + Fourteenth Amendment Rights.

Johnson 42 USC § 1983

First Amended complaint page 22

# 52 By failing to intervene, stop, And/or mitigate the harm suffered by π As A Result of the retaliatory Adverse Actions by Δ's Hicks, Shotzburger, And Ryan, despite being placed on Notice of the Constitutional Violations by π's grievances, Appeals And letters of complaints, Δ Danberg evinced deliberate Indifference toward the tacit Authorization And Ratification of Actions of Δ's Ryan, Shotzburger and Hicks, And others not listed, Against π.

# 53 Δ's Acted As described Above intentionally, Knowingly, recklessly, excessively, maliciously, And/or With reckless indifference or disregard of Constitutionally protected rights.

# 54 Δ's conduct violated clearly established rights belonging to π, which Rights reasonable persons in Δ's position Knew or should have Known of.

# 55 As A direct And proximate result of Δ's Actions described Above, π has suffered Not only deprivations of her Constitutional rights, but also Significant injuries, damages And losses, for which she is entitled to redress.

# 56 π incorporates herein the Chronology of Retaliatory Actions by Δ's Danberg, Ryan, Shotzburger, Hicks And Brown And others under their command

## Count III

Pursuant to 42 USC § 1983 for Declaratory Relief And Damages for Violation of π's Right to be free from Excessive Force.

#57 π hereby incorporates by reference the foregoing paragraphs of this First Amended Complaint.

#58 π At No time Agressed herself towards Cpl. Brown from court transport And her infliction of injury to π's wrist(s) was A violation of π's Constitutional Right to be free from Assault by An Officer or Another Inmate which violates the 8th Amendment.

#59 π's Constitutionally protected Actions to continue her redress Against Cpl Brown was A substantial And motivating factor for Δ Brown's Actions Against her.

#60 Δ's conduct caused injurie(s) that would chill A person of ordinary firmness. ~~[illegible] continuing to engage~~

#61 Δ's Acted As described Above And in the original papers/Complaints filed AND As in the Chronology of Events involving Excessive Force And Retaliation by CPL Brown, C+T under color of State Law.

#62 By Action of Δ Brown, And As described in this First Amended complaint And original papers filed And Chronology of Events of Retaliation And Excessive Force with cover-up by all Δ's following injury of π that there was further retaliation for her Legally Protected Rights under 1st, 6th, 8th Am[illegible]

#63 By failing to intervene, stop And/or mitigate the harm suffered by π As A result of the continued Excessive Force, Retaliation, And Adverse Actions of Δ Brown, despite being placed on Notice of the Constitutional Violations of infliction of injury And pain by Δ Brown directly to π, with π's grievances, letters of complaints And verbal complaints Δ Ryan and Δ Danberg evinced deliberate indifference toward And tacit Authorization And Ratification of the continued infliction deliberately bestowed by Δ Brown.

#64 Δ's Acted Above As described to intentionally, knowingly, recklessly, excessively, maliciously, deceptively, And/or with reckless indifference or disregard of constitutionally protected Rights And with intent to cover-up the deliberate infliction of Excessive force on π by Δ Brown in July 2006 — And which continued from March — June 2007 on Court Runs.

#65 Δ's conduct individually And together violated clearly established rights belonging to π, which Rights reasonable persons in Δ's position knew or should have known of.

#66 As A direct And proximate result of Δ's Actions described herein And in the original filings And in the Chronology π has suffered not only deprivation of her Constitutional rights, but also significant physical injuries that no person should be subjected to, plus damages And losses that will Affect π for the Rest of her life, And therefore is entitled to redress.

#67 π incorporates this First Amended Complaint into the record with original Complaints, modified complaints And prays This Honorable Court for Relief.

## Conclusion

Wherefore, π Joni Lee Johnson Respectfully requests that this Honorable Court enter judgment in her favor And Against the Δ's, And that this Court further:

a. Declare that the Acts set forth herein are in violation of π's Rights under the Constitution And laws of the United States.

b. order Appropriate declaratory, injunctive, And/or Equitable Relief, including Appropriate orders directing Federal Agencies developed to protect Prisoners held in State/County facilities to investigate And oversee the day to day operations of the Baylor Womens Correctional Institution; Remove Cpl. Brown of C+T Transport pending full investigation into her continued And deliberate infliction of pain And injury upon π on Any future Court Runs And her continued infliction of pain + injury to women on A daily basis being transported under her care; Remove or suspend Δ Hicks from any post Allowing him Access to inmates or π pending full investigation of his Actions; to order A full inspection into the Conditions of the building And Health/Safety issues described herein by A FEDERAL AGENCY And oversee the Correction of the unsafe And unhealthy building conditions; Issue An Injunction or Court order to protect π from Any further retaliation, loss or injury by Δ's or Any other staff of the DOC, and Allow All matters herein to proceed.

c. Award π Compensatory, punitive, consequential damages, including damages for emotional distress, physical pain, injury And the liklihood of permanent physical damage And distress, humiliation, fear, disregard for concerns by Administrative staff, And other pain and suffering on all claims Allowed by law in an amount to be determined At trial, including but Not limited to loss of liberty, economic loss, And All other difficulties, suffering And other hardships arising from Δ's Retaliatory, deliberate indifference, Actions, And medical conditions worsened, exacerbated or Resulting from the Δ's Actions that were protected by π's Constitutional Rights to be free from such deliberate And consequential Actions.

d. Award π economic losses on all claims Allowed by law

e. Award π punitive damages, on all Claims allowed by law in an amount to be determined At trial.

f. AWARD π Any legal fee's, expenses or Costs Associated with this Action under 42 USC §1983 And As otherwise Allowed by law

g. Grant π Any other relief this Court may deem just And proper

π Asks This Court to please review this pleading in Consideration that π is An inmate in an institution without computer Access for legal Research + Document preparation, to Review this document with liberal understanding of the Antiquated provisions for inmates At D.O.C. And that π is Not An Attorney And procedural errors may present.

I, Joni L. Johnson Respectfully submits This First Amended Complaint to the United States District Court on December ~~26~~ 27, 2007 by placement in the prison mail Box Depository under the prison mail box Rule this first Amended Complaint is deemed filed.

Respectfully submitted,

Joni L. Johnson
Joni L. Johnson
12/~~26~~ 27/07

Grievance October 24, 2007
(Exhibit)

To: Captain Repetti + Staff LT. Smith through LT. Fields + Director Walker, Food Service Administrator.

FROM: Joni L. Johnson Inmate # 00182823 unit 4 on behalf of herself and all others similarly situated as in United States District Court for the District of Delaware 1:07:394-GMS (class status pending)

RE: Exhaustion of Administrative Remedies and Attempt at Informal Resolution Regarding sanitation and safety concerns at The Baylor Womens Correctional Institution, 660 Baylor Blvd, Newcastle, DE 19720 Hereinafter, BWCI.

The following matters Require immediate attention and Resolution based on the safety and Health concerns of myself and all others similarly situated.

The Safety and Sanitation conditions at BWCI violate the 8th amendment standards by exposing TI Joni Johnson and all others similarly situated to further injury as will be shown herein, to infectious disease and contamination ~~as~~ by failing to provide proper protective wear, sanitation products, safety equipment and safety counseling / Education and Directives.

The 8th Amendment Requires that the State may not inflict "cruel and unusual ~~Protection~~ Punishments". Captain Repetti, Director Walker (Food service), Staff LT Smith and LT. Fields are Responsible for the Day to Day operations safety + sanitation w/supplies at BWCI.

It is their Responsibility, under the direction of Warden Ryan, under direction of Chief Kearney and commissioner Danberg to assure safety inspections and corrections thereof.

Π asserts that the issues and facts stated herein deprive Π, and all others similarly situated that, "alone or in combination," the conditions deprive "the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct 2392, 2399 (1981).

The Rhodes court has defined that basic human needs that the prison is constitutionally required to provide: food, clothing, shelter, medical care and reasonable safety; warmth, exercise and the basic elements of hygiene.

All Medical Issues are being addressed separately with Correctional Medical Services, Inc.

I. UNSANITARY FACILITY

*see Attached Literature*

-Mold in Ventilation system that expose inmates to Respiratory illness. Π suffers with C.O.P.D. and in every unit she has been housed (8, 7, 9, 5 and 4) has a black slimey substance, resembling mold in the A/C / Heat vents. Π has difficulty breathing which worsens during lock in times because the air forced into the cell or housing area is contaminated. (A Nurse once stated to Π that I/m's coming into the institution with No Respiratory problems, will almost always Need an inhaler while here). Π has written grievances and gone as far as Notification to as high up as Commissioner Carl Danberg on this issue.

Π has [illegible] been Responded to.




**toxic-black-mold-info.com**
Tips for *Finding*, *Cleaning*, and *Preventing* Indoor Mold Problems.

**Sections:**

Signs of Mold
Finding Mold
Prevention Tips
Mold Clean Up

Background Info on Mold
Health Effects
About Different Species of Mold
Humidity Sensor Buying Guide
About TBMIC
Mold Test Review
Additional Mold Resources

# Health Risks from "Toxic" Mold

Allergy
Irritation
Invasive Disease

---

According to a 1999 Mayo Clinic Study, **nearly all chronic sinus infections** (afflicting 37 million Americans) are a **result of molds**.

A **300% increase** in the **asthma rate** over the past 20 years has been **linked to molds**. (according to 1999 USA Today Cover Story)

---

Molds (sometimes referred to as black molds, even though mold can come in a variety of colors) can cause a wide array of adverse responses in humans depending on the type and quantity that is present. However, these are not the lone factors when considering the health affects to mold exposure. Since dose and human response can be highly individualistic, the sensitivity of the person exposed is also an important consideration. For example, infants and young children, the immune-compromised, and the elderly are at an increased risk of experiencing adverse health effects related to mold exposure.

There are many routes of exposure to molds including dermal contact, ingestion, and inhalation. The health risks associated with mold exposure include, but are not limited to: allergic reactions, irritation associated with volatile organic compounds (VOCs), invasive disease, mycotoxicosis.

**Allergy**

Allergic reactions are elicited when a substance such as mold that is not harmful in itself causes an immune response in susceptible individuals. The most common symptoms of an allergic response to increased levels of mold range from runny noses, itchy-watery eyes, coughing, sneezing, and throat irritation to more severe symptoms caused by chronic conditions such as sinusitis and asthma.

**Irritation**

Fungi produce Volatile Organic Compounds during the process of degrading substances to obtain nutrition. The VOCs are the cause of the typical "moldy/musty" commonly associated with fungal contamination indoors. Exposure to high levels of VOCs may irritate the mucous membranes and the central nervous system leading to symptoms of headaches, decreased attention span, difficulty in concentration, and dizziness.

**Invasive Disease**

This type of disease is uncommon. It is an opportunistic infection caused by exposure to microorganisms that don't normally produce disease in healthy individuals, but affects those persons with abnormally functioning immune systems. For example, those with HIV/AIDS or those receiving immunosuppressive drugs such as transplant or chemotherapy patients. Some common fungi that have been associated with invasive disease are *Aspergillus, Cladosporium, Mucor,* and *Rhizopus*.

---

**Air Purification to Reduce Amount of Spores Inhaled:**

You may want to use an **air purifier** to minimize the airborne particulate, which allows mold spores to disperse to other areas of the home/house or building.

**HEPA air filters** are the most effective type of filter at capturing allergens such as mold spores. The Surround Air Multi-Tech air purifier uses a HEPA, in addition to a germicidal UV to destroy harmful mycotoxins created by mold.

**Signs of Mold** | **Finding Mold** | **Prevention Tips** | **Mold Clean Up**

Mold Background | Mold Health Effects | Mold Species | About TBMIC

Humidity Sensor Buying Guide | Dehumidifier Buying Guide | Mold Test Review | Articles

| Home |

**Toxic Black Mold Information Center**
Div. of Indoor Health Products, Inc.
334 North Marshall Way, Suite C
Layton, UT 84041

Privacy Policy

Copyright © 2006 Toxic Black Mold Information Center, All Rights Reserved.




***toxic-black-mold-info.com***
Tips for *Finding*, *Cleaning*, and *Preventing* Indoor Mold Problems.

**Sections:**

Signs of Mold
Finding Mold
Prevention Tips
Mold Clean Up

Background Info on Mold
Health Effects
About Different Species of Mold
Humidity Sensor Buying Guide
About TBMIC
Mold Test Review
Additional Mold Resources

# "Toxic Black Mold": Background Information

Fungi Kingdom
Molds
How a Mold Reproduces - It's Life Cycle

---

## Fungi Kingdom

The Kingdom Fungi is a diverse kingdom **consisting of** over 1 million species and includes mushrooms, **molds**, and yeasts. Fungi are mainly saprophytic meaning they obtain their nutrition from the breakdown and decay of organic matter. They can thrive in many places such as soil, plant litter, wood, live plants, dung, animal remains, fungal remains, etc, and play a vital role in the environment as a decomposer of dead-plant matter.

## Molds

Commonly called mildew, molds (sometimes referred to as "black mold") are a subset of fungi that produce fluffy or powdery growth on surfaces. Toxic molds can grow on cloth, carpets, leather, wood, sheetrock, insulation (and on human foods) **when moist conditions exist.**

Molds are ubiquitous, the **most common form of fungus** on earth, and may grow at high levels indoors, in a home or building, if the right environmental conditions exist. Factors that influence the distribution of molds are **most importantly a source of moisture**, proper nutrients, temperature, and light.

Carbon containing materials that are abundant both indoors and outdoors may provide the essential nutrients for growth. Sources of moisture, which are usually the limiting and most important factor. They can come from high humidity levels, condensation, and water intrusion due to a number of events such as indoor leaks and floods. Temperature and light may affect fungal growth, but are usually not a limiting factor since most fungi can grow in light and total darkness.

Excessive exposure to molds can lead to adverse health issues for humans. The affects of human exposure to mold is not a new, emerging problem but has been manifested for many years. Documentation of mold growth indoors dates back **as far as the Old Testament:**

*From Leviticus Chapter 14, verses 33-57*

- On the 7th day the priest shall return to inspect the house. If the mildew has spread on the walls, he is to order that the contaminated stones be torn out and thrown into an unclean place outside the town. He must have all the inside walls of the house scraped and the material that is scrapped off dumped into an unclean place outside the town. Then they are to take other stones to replace these and take new clay and plaster the house

- If the mildew reappears in the house after the stones have been torn out and the house is scraped and plastered the priest is to go and examine it and, if the mildew has spread in the house, it is a destructive mildew: the house is unclean. It must be torn down – its stones, timbers and all the plaster – and taken out of the town to an unclean place.

- Anyone who goes into the house while it is closed up will be unclean till evening.

- Anyone who sleeps or eats in the house must wash his clothes.....

Molds can cause a variety of reactions in hypersensitive individuals ranging from **allergic responses** to **neurological damage**. Molds may proliferate in almost any indoor environment where excessive amounts of water and organic matter persist.

The key factor in limiting mold exposure indoors is to prevent it's growth through moisture control, maintenance, and proper cleaning methods.

**How a Mold Reproduces – It's Life Cycle:**

When the appropriate conditions for growth exist: presence of moisture, nutrients, temperature, etc, the mold begins to reproduce via it's life cycle.

**Hyphal Growth:** Hyphae are the thread-like filamentous cells that release enzymes which degrade and absorb nutrients from a substrate (ie. oganic debris, cellulose, wood, almost any carbon containing material including human skin). Upon obtaining it's nutrition, the hyphae will grow into a mycelium, the main body of the fungus which is also the visible portion.

**Spore Formation:** Spores form on the ends of some hyphael cells. The formation of spores is dependent on a variety of environmental factors including light, oxygen levels, temperature, and nutrient availability.

**Spore Dispersal:** After the spores are formed, they are released

into the air and carried elsewhere to begin the process of germination and growth all over again. Mold spores are highly resistant and durable. They can remain dormant for years in even hot and dry environments.

**Spore Germination:** Once the spore is dispersed to a new area and when the appropriate conditions exist, moisture and nutrient availability, the spore will begin to germinate into a new hyphael cell.



**800 Series Humidity Sensors**

*Prices from $18.99 to $29.99*

**Signs of Mold** | **Finding Mold** | **Prevention Tips** | **Mold Clean Up**

Mold Background | Mold Health Effects | Mold Species | About TBMIC

Humidity Sensor Buying Guide | Dehumidifier Buying Guide | Mold Test Review | Articles

| Home |

**Toxic Black Mold Information Center**
Div. of Indoor Health Products, Inc.
334 North Marshall Way, Suite C
Layton, UT 84041

Privacy Policy

Copyright © 2006 Toxic Black Mold Information Center, All Rights Reserved.

-3-

— Dust: Along the walls in the higher unreachable areas there is thick lint and dust that gathers around the intake vents for circulation into the housing units. π has suffered COPD exacorbation several times and been hospitalized accordingly three times since at BWCI. The exacerbation is caused by a combination of several environmental factors at BWCI; Dust and mold included with improper & inadequate ventilation.

— Rust: Bathrooms, shower rooms, Bunk Beds and other Miscellaneous areas that has metal objects are turning to Rust. Shower Room doors have thick shards of metal that have Rusted away and fall into the water that remains on the shower floor while inmates, including π are showering. Even with shower shoes on the "Rusty water" comes up over the shoes

— Stair Railings: Not secured and because of moisture in the wood they are not stable and run the risk of injury. π was on the upstairs tier and because of her handicap which Requires holding onto Railing she was moved and given a permanent medical memo to remain downstairs. The Railings are still loose and Dangerous.

— Floors: Throughout entire institution when A/C or cooling fans not Running, the floors sweat and become slick. This is a Result of the moisture through the walls and vents. π has had one fall

-4-

that broke her 9th Rib (x-ray verified) and caused some sort of very painful either dislocation or break of Right hand. No Medical treatment or inquiry.

— Spiders: The "spider infestation" continues even as the weather gets cooler. π has been bit at least one time (2x3 now) on her left arm. As a Result of the spider bite, π now has a series of blisters up and down her left hand and arm. The "blisters" pop themselves 1-3 at a time, leaving sores and causing bleeding. Although the Institution alleges there are no cases of bacterial or staph infections at BWCI, π was treated with an antibiotic and an antibiotic ointment. She has been charged a total of $10.00 by BWCI for Medical treatment (2 visits at $4.00 each and $2.00 for an expired sample of Antibiotic ointment). The prisoners, including π, have Requested on multiple occassions to have the common areas, cells, and shower/toilet facilities exterminated. In the 9 months π has been at BWCI, the areas housing inmates has never been treated for spiders or other vermin. Inmates should not be charged a fee for a Medical condition arising out of an Institutional failed obligation. i.e. extermination and Protection. Yet, these very same staff members have in their office(s) Insecticides for a Number of vermin, including spiders. The use is strictly for staff office areas. The Institution Administration has an obligation to the inmates as well as staff to protect from harm. There are multiple inmates with this exact infection that * will be included upon class Action *

— Other Bugs / mice / worms / Knats / moths Water Bugs / food service area has mice droppings around dry food products / Ants / Bed bugs are all present in the units, housing areas, Common areas, food Service, Mattresses, blankets are moth eaten.

— Shower Bugs (Worms+): There are hard shell black bugs that are in and around the shower areas commonly used by population. Worms come up through the shower drain areas especially following a hard Rain. Worms get into the lower Lying areas during heavy rainstorms.

— Showers: The shower areas have mildew/mold in the ceiling and walls. During showering, from moisture build up, the beads of water that form on the ceiling mix with mildew. TI has experienced a drip from the shower on her skin and it turned into A sore. This has happened to other Im's as well. Statements will be included upon Class Action status. (2x's This happened to TI The fungus has caused open sores — 1 on head, 1 on Shoulder

— MRSA: BWCI alleges there are no known cases of MRSA in this facility. Yet, Inmates are getting sores similar to the defined MRSA symptoms and being treated with an Anti Retro Viral Antibiotic, consistent with that of MRSA treatment.

There are little to No precautions At BWCI to Avoid the spread of MRSA or other infections through the Inmate population. Matters to be Considered for humane protections from spreading germs, bacteria, virus' and illness Rapidly through population, include:

1. Bathroom Toilet facilities that are shared (common area) among 3 or more Inmates as a group should include a.) paper toilet seat covers (b) toilet paper dispensers with the pull down vs. having toilet paper rolls sitting on floor, back of toilet or sink to share. Oftentimes, inmates will have an element spread through the holding of a T.P. Roll on hands which may include: Blood, fecies, urine or other unsanitary conditions that the use of A "common" toilet paper Roll being handled will spread dangerous germs & bacteria (c) Paper towels in Bathroom with a pull down dispenser and to educate the inmates of Appropriate use to avoid spread of germs. i.e. Pull down paper towel after washing hands w/Antibacterial soap from a dispenser. Use the paper towel to dry hands, flush toilet, turn off water, and hold while opening door to exit. This Avoids the spread of body fluid contamination. not all inmates will use this procedure; however, making it available to those that will, give Rise to lesser infection. (d) Antibacterial soap dispenser over sink in bathroom. (e) Cleaning supplies available that include Antibacterial scrubs, cleansers and equipment to Keep clean at least 3 x's per day with the use of gloves by the inmate assigned this daily function.

2. Officers that put on gloves to pat down inmates should change gloves from one inmate to the Next. The gloves are put on to protect the corrections officer from contamination or sores that may transfer from the inmate to the staff. There is No consideration for the inmate that follows. The C/O is being protected but Not the inmates. i.e. Pat down including hair view. The C/O Runs Gloved hand through hair down arms, Back, torso between legs & down to the feet. The shoes are removed and the gloved hand picks up the shoe and taps it. the Same gloved hand follows to the Next inmate And So on. It may be 4 inmates and it may be 60 all with one pair of gloves spreading whatever may be from one to the other. If the C/O need's to be protected, so does the inmate.

3. Touching door handles and buttons. officers will Wear blue gloves all day to prevent touching door openers, handles or areas exposed to inmate population. Some officers carry portable Purell Hand sanitizer dispensers on their belts. For equal protection, there should be hand sanitizer stations throughout the building At doorway areas that require touching to enter or exit.

4. Sanitizers: Liquid sanitizers should be Available for Cleaning Bathrooms, Showers, cells, tables, etc And I/m's EDUCAted on the proper use.

These precautions will lessen the risk of further spread * of MRSA, Bacterial infections, HIV, Hepatitis and Tuberculosis.

— Food Service: Inmates are screened for food service employment, but permitted to work with Hepatitis And HIV. Although, Some may find it discriminatory to not allow Inmates With infectious disease to work in food service, those rights are limited to an extent, in that: The prison is allowing a presumed risk by placing inmates with infectious diseases in a position to infect other inmates (The 9th Circuit held in Gates v. Rowland, 39 F.3d 1439, 1448 (9th Cir. 1994) (finding legitimate a penological interest that allowed prison to discriminate against HIV + prisoners by restricting them from food service jobs)). In Gates, although the health risk of spreading infectious disease is small, the perception of a risk by other prisoners could be threatened. Thus the penological interest is in promoting SAFety.

Inmates with infectious disease could and often times are ① angry that someone spread the disease to them or ② mentally ill and act out violently with their infectious disease and therefore should Not be exposed to food service out of Risk that A vindictive act may occur that "could" infect the inmate population.

i.e. Body fluids deliberately put into food to be served to population.

Ihm's in Units 4 and units 8 are served in the Unit. Utensils + items are not individualized as they are in population. Therefore, further spread of germs is Prevalent.

– Inmates locked in areas not designed for housing with No Running water or toilet facilities. maximum security areas of housing have taken areas used as linen closets and office space and made prison dormitories of the areas. Doors are Key locked instead of Automatic locks. TT woke one evening and C/o Coppage was working and she Needed to use RestRoom. It was more than one hour before the lock was opened because of A malfunction. C/o NovAK finally came in and unlocked the door. In an institution emergency the C/o's would NOT have stayed around to evacuate the Key lock doors. TT was placed iN danger Accordingly. TT ALSO suffers with seizure disorder; Again - with the dao lock, it could be deadly.

— Furthermore, in these new make-shift cells, inmates are locked iN without Running water and toilets, which cause an inmate to not be able to "promptly dispose of their wastes".

— Inadequate Ventilation: This is A problem throughout the entire pRison— AiR that is contaminated with germs, virus', dust, mold, mites, etc is Recirculated into the units. With maintaining a minimum temperature Requirement, germ spread is Reduced. However, the heat + A/c system At BWCI does Not properly work. It never has. one side has freezing cold air + the other side excrutiating heat. There is No mix. This is A year Around process. TT has COPD + when heat is on needs fan for fresh air. Medical ordered, but Warden denied the medical EQUIPMENT ORDER-

— Falling, broken ceiling Tiles!

There are drop ceilings throughout various areas in the prison. Many of them are cracked, chipped or just broken. Outside rain and wind will often cause these ~~tiles~~ tiles to break more and fall. TI slept underneath one of these crumbling tiles for around two months. Every morning she had to shake the "crumblings" from her bed and pillow. Another inmate had a tile just fall on her and she has severe neck pain, swelling and stiffness - Almost three weeks After medical ordered her an xray - it still has not been done. The inmate has All symptoms worsening on a daily basis. This just happened again to Another Inmate on whitg - w/ this time the lighting fixture fell w/ ceiling - she has glass cuts in head w/o med tx.

— Inadequate + Aerosol Cleaning Supplies

"If" we are lucky enough to be given the privilege of Cleaning Supplies to use in our housing areas - what we are given includes a soap ball, aerosol window cleaner, powdered cleanser, and aerosol Disinfectant spray. Inmates, such as TI with Respiratory illness cannot be exposed to Aerosols or High cleansing fumes. Hence the introduction into the modern society of citrus and orange liquid, non aerosol cleansers. These non-aerosols are also friendlier to the environment. Furthermore, not every inmate is blessed with the use of cleaning supplies which should be dispensed weekly by A staff to each inmate Accordingly.

Black Slimey Mold in the Ventilation System And Mildew Build-up in the Showers + Bathroom areas with Worms And other bugs And Bacteria living in And building throughout the entire Institution. The moisture from the building wet lands that encompass continues to breed more mold, mildew And Rust develops on all metal parts that Are within the housing area's. Rusted beds on Units 5, 7 And Unit 8 Where Π was housed for 7 months of her incarceration has exposed Π to Rust particles while sleeping And breathing in the air the Rust dust that floats from erosion. Π is Now on Unit 4 with Wooden Bed And Furniture; however, there is still Rust erosion in the ceilings that fall into the Air And enter Π's Respiratory System. Breathing the "Sick Air" of the Building from mold Build-up creates A further Risk to Π's Respiratory System.

Dust throughout the ventilation system, continues to increase And float throughout the institution, Affecting the Air that Π breathes. There is No Procedure set up to Clean or Vacume the Dust from intake Vents And out Vents; Dust buildup on the Walls Around the upper areas that continues to float through the air and enter into Π's Respiratory system that limits her breathing And other Respiratory health.



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
245 McKEE ROAD
DOVER, DE 19904

Carl C. Danberg
Commissioner

(302) 739-5601
Fax: (302) 739-8221

November 20, 2007

Joni Johnson
SBI# 00182823
Baylor Women's Correctional Center
660 Baylor Blvd
New Castle, DE 19720

Dear Ms. Johnson,

Thank you for your letter or October 4th. I apologize for the delay in responding.

As I have previously informed you, you will not be permitted to dictate the frequency of your law library visits of the amount of time you spend in the law library. Your access will be determined by your need, based upon the cases you have pending.

As for your letter to the editor, I read it myself when it was published. While not completely accurate I saw nothing offensive about it. Moreover, I agree that we need more services for the women at BWCI; it is my hope that we will be able to expand BWCI to reduce crowding and increase programming space.

Thank you.

Sincerely,

Carl C. Danberg
Commissioner

Trk# 557

CCD:lmd